RECORD NOS. 14-1704(L); 14-1706

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

BURCAM CAPITAL II, LLC

*Debtor – Appellant*

v.

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, successor-in-interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-GG1, Commercial Mortgage Pass-Through Certificates, Series 2004-GG1 and BANK OF AMERICA, N.A., successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Mezz Cap Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C1, by and through its special servicer, CWCapital Asset Management LLC

*Creditors – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

_____

BRIEF OF APPELLEES
_____

VENABLE LLP
Gregory A. Cross
Brent W. Procida
Catherine Guastello Allen
750 East Pratt St., Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

WOMBLE CARLYLE SANDRIDGE
  & RICE LLP
Constance L. Young
301 S. College Street
Charlotte, NC 28202
Telephone: (704) 331-4972
Facsimile: (704) 975-4370

*Attorneys for the Creditors - Appellees*

**FEDERAL RULE OF APPELLATE PROCEDURE 26.1**

**CORPORATE DISCLOSURE STATEMENT**

U.S. BANK NATIONAL ASSOCIATION ("U.S. Bank") is the trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-GG1, Commercial Mortgage Pass-Through Certificates, Series 2004-GG1 (the "Trust"). U.S. Bank is a national banking association whose corporate parent is U.S. Bankcorp. The Trust is a New York common law trust which has no corporate parent.

BANK OF AMERICA, N.A. ("BofA") is the trustee for the Registered Holders of Mezz Cap Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C1 (the "Mezz Trust"). BofA is a national banking association whose corporate parent is Bank of America Corporation. The Mezz Trust is a New York common law trust which has no corporate parent.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................1

STATEMENT OF THE CASE...........................................................2

    The Loan Transactions ............................................................2

    The Foreclosure Proceeding ....................................................4

    The Claims .............................................................................5

    The Plan and Disclosure Statement ..........................................5

SUMMARY OF THE ARGUMENT ................................................11

STANDARDS OF REVIEW ..........................................................13

ARGUMENT ..............................................................................14

    I.    Applicable Law ...........................................................14

    II.   The Debtor's Classification Scheme is Improper ..................14

        A.    Segregation of "No" Votes After Balloting Is a *Per Se* Violation of. ..................................................15

        B.    The Status of a Claim Cannot Be Altered By Assignment..........17

        C.    The Debtor's Classification Scheme Is a Disguised Section 1126(e) Objection .........................................19

        D.    *Deep River* and *Grandfather Mountain* Do Not Support the Bankruptcy Court's Decision................................20

        E.    Different Treatment Does Not Legitimize Separate Classification.............................................21

        F.    Merely Continuing to Do Business With Certain Creditors Does Not Justify Separate Classification.....................22

        G.    The Cases Cited by the Debtor Do Not Support Separate Classification.............................................23

        H.    The Debtor Has Not Met Its Burden of Proof in Establishing a "Business Justification" for Separate Classification.............................................25

        I.    The Pre-Confirmation History of the Case Demonstrates that the Debtor's Business Justification is Fiction.......................28

i

      J.     The Debtor's Post-Confirmation Claim Objections are Irreconcilable with its Business Justification................................30

III.    The Debtor Failed to Establish the Existence of an Impaired Consenting Class Under Section 1129(a)(10)...........................................33

      A.    Classes 5 and 6 are Artificially Impaired.....................................33

      B.    The Note Holders Were Not Permitted to Conduct Discovery on the Potential Insider Status of the Attorneys and Accountants................................................................................35

IV.    The Debtor Failed To Establish that the Plan was Filed in Good Faith Under Section 1129(a)(3)................................................................37

V.    Even if the Court Approves the Debtor's Classification Scheme, Remand is Required for Further Proceedings Before Confirmation is Possible .........................................................................38

CONCLUSION ..........................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266 (2d Cir. 1983) .....................18

*Crosby v. City of Gastonia*, 635 F.3d 634, 643 n. 10 (4th Cir. 2011) ...................13

*Enron Corp. v. Springfield Assoc. LLC*, 379 B.R. 425 (S.D.N.Y. 2007) ......... 17, 18

*Everett v. Pitt Cnty. Bd. of Educ.*, 678 F.3d 281, 291 (4th circuit)..........................13

*Goldie v. Cox, 130 F.2d 695 (8th Cir. 1942)* ...........................................................18

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe*
    *Enters., Ltd.),* 994 F.2d 1160 (5th Cir.) ............................................................13

*In re Adelphia Communications Corp*, 359 B.R. 54 (Bankr. S.D.N.Y. 2006)........19

*In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2006).....24

*In re Bernhard Steiner Pianos U.S.A., Inc.,* 292 B.R. 109 (Bankr. S.D. Tex.
    2002) ...................................................................................................................25

*In re Boston Post Road L.P.,*21 F.3d 477, 482-3 (2d Cir. 1994)............................34

*In re Briscoe Enters., Ltd.,* 994 F.2d 1160, 1163 (5th Cir. 1993) ..........................14

*In re Chateaugay Corp.*, 177 B.R. 176 (S.D.N.Y. 1995)........................................24

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004)........ 22, 24, 26

*In re CoServ, L.L.C., 273 B.R. 487 (Bankr. N.D. Tex. 2002)* ..................................23

*In re Deep River Warehouse, Inc.,* 2005 WL 2319201 Case No. 04-52749
    (Bankr. M.D.N.C. 2005)......................................................................... 20, 21, 22

In re Dunes Hotel Assocs., 188 B.R. 174, 180-81 (Bankr. D.S.C. 1995) .. 33, 35, 36

*In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (Bankr. S.D. Ga. 1990) .........38

*In re Foust*, 52 F.3d 766 (8th Cir. 1995)..................................................................13

*In re Grandfather Mountain L.P.*, 207 B.R. 475 (Bankr. M.D.N.C. 1996)...... 20, 21

*In re Greystone III Joint Venture,* 948 F.2d 134 (5th Cir. 1992) ............................14

*In re Greystone III Joint Venture,* 995 F. 2d at 1275 (5th Cir. 1992)......................15

*In re Kmart Corp.,* 359 F.3d 866 (7th Cir., 2004) ...................................................23

*In re Lichtin/Wade, LLC, 2012 WL 6576416 (Bankr. E.D.N.C. Dec. 12, 2012)*.....19

*In re Metion, Inc.,* 301 B.R. 634 (Bankr. S.D.N.Y. 2003)......................................17

*In re RadCo Props., Inc.,* 402 B.R. 666 (Bankr. E.D.N.C. 2009) ..........................14

*In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894
    (Bankr. S.D. Ohio 2004) ........................................................................ 22, 24, 26

*In re Swartville, LLC*, Case No. 11-08676, 2012 WL 3564171 *5-6 (Bankr.
    E.D.N.C. 2012) .............................................................................................. 35, 37

*In re Tropical Sportswear Int'l Corp.,* 320 B.R. 15 (Bankr. M.D. Fla. 2005)........23

*In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986).........................................25

*In re United Am., Inc.*, 327 B.R 776, 782 (Bankr. E.D. Va. 2005) ................. 23, 26

*KB Toys, Inc.,* 470 B.R. 331 (Bankr. D. Del. 2012) ......................................... 17, 18

*Matter of Am. Biomaterial Corp.*, 954 F.2d 919, 922 (3d Cir. 1992)............... 10, 31

*McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524 (11th Cir. 1995)...........................................................................................37

*Three Flint Hill L.P. v. Prudential Life Ins. Co. (In re Three Flint Hill L.P.),* 213 B.R. 292 (Bankr. D. Md. 1997) ..........................................................36

*Travelers Insurance Co. v. Bryson Properties (In re Bryson Props., XVIII)*, 961 F.2d 496 (4th Cir. 1992) ........................................ 1, 11, 13, 14, 15, 16, 17, 21, 22

*U.S. Dept. of Health & Human Servs. v. Smitley*, 347 F.3d 109 (4th Cir. 2003) ....13

*Ward v. Sun Valley Foods Co.,* Inc., 212 Fed. Appx. 386 (6th Cir. 2006).............18

*Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.),* 7 F.3d 127, 132 (8th Cir. 1993) ... 33, 34, 35

**Statutes**

§ 101(31) .............................................................................................................9

§ 1111(b)............................................................................................................21

§ 1122 ........................................................................................... 7, 8, 15, 18, 20

§ 1125...................................................................................................................5

§ 1126 ................................................................................... 1, 9, 11, 19, 20

§ 1129 .......................................................................... 7, 14, 33, 34, 35, 37, 38

§ 506(b)..............................................................................................................39

§ 509(c)..............................................................................................................24

**Other Authorities**

Fed. R. Bank. P. 8013 .......................................................................................13

Fed. R. Bankr. Pro. 3001(e) ..............................................................................18

Fed. R. Evid. 201 ........................................................................................ 10, 31

**Treatises**

COLLIER ON BANKR. ¶ 1122.03[3][a] (16th. Ed. 2012).................................... 17, 21

Moore's Fed. Prac. 3d, § 310.10[5][b] ........................................................ 10, 31

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Does the post-balloting creation of a new class of claims containing only the "no" votes constitute improper manipulation of voting pursuant to this Court's decision in *Travelers Insurance Co. v. Bryson Properties (In re Bryson Props., XVIII)*, 961 F.2d 496 (4th Cir. 1992)?

2.    Is the character of a claim for purposes of classification determined by the legal attributes of the claim itself or current holder of the claim?

3.    Is it proper for a debtor to disenfranchise a creditor who purchased claims by segregating the acquired claims based on the identity and perceived motives of the purchaser rather than using the procedure for designating votes established by Section 1126(e) of the Bankruptcy Code?

4.    Did the Debtor articulate and present sufficient evidence of a legitimate business justification for segregating "no" votes other than the manipulation of voting?

5.    If the Court approves the Debtor's classification scheme is remand required to (i) permit discovery on the insider status of the creditors voting in favor of the Plan (ii) revalue the collateral and reassess feasibility in light of the passage of time and lack of a stay pending appeal; and/or (iii) redo the balloting in light of the changes in the creditor body?

## STATEMENT OF THE CASE

The above-captioned appeals arise out of the Chapter 11 bankruptcy case filed by the Debtor on June 28, 2012 (the "Petition Date"). (JA 140-141). The Debtor owns certain real and personal property, consisting of, among other things, retail and office units located at 510 Glenwood Avenue, Raleigh, North Carolina (as more particularly described in the Deed of Trust (defined below) the "Property"). (JA 196-274). The Debtor asserts that the value of the Property as of January 31, 2013 (the date of the confirmation hearing) was $17,330,000.00. (JA 706).

*The Loan Transactions*

On or about September 4, 2003, Archon Financial, L.P. (the "Original Lender") loaned money to the Debtor in the principal amount of $12,982,900 ("Loan A") and $806,000 ("Loan B" and, together with Loan A, the "Loan"). (JA 168-177) (JA 180-189). Loan A is evidenced by that certain Deed of Trust Note (Note A) dated September 4, 2003 (the "A Note"), and Loan B is evidenced by that certain Deed of Trust Note (Note B) dated September 4, 2003 (the "B Note" and, together with Note A, the "Notes").[1] (JA 168-177) (JA 180-189).

---

[1]    The A Note and all related loan and security documents shall be collectively referred to herein as the "A Loan Documents;" the B Note and all related loan and security documents shall be collectively referred to herein as the "B Loan Documents." The A Loan Documents and the B Loan Documents shall be collectively referred to herein as the "Loan Documents."

The Notes are secured by, among other things, a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 4, 2003, which was recorded on September 4, 2003 with the Register of Deeds for Wake County, North Carolina (the "Official Records") in Book 10421, Pages 1260-1339 (the "Deed of Trust"). (JA 196-275). As further security for repayment of the Loan, the Debtor executed and delivered an Assignment of Leases and Rents dated to be effective as of September 4, 2003, which was recorded on September 4, 2003 in the Official Records in Book 10421, Pages 1340-1354 (the "ALR"). (JA 276-297). Pursuant to the Deed of Trust and the ALR the Note Holders hold valid and perfected first-priority liens and security interests in the Property, which include all rents, income and proceeds from the Property. (JA 276-297) (JA 319-320).

The A Note Holder[2] is the current holder of the A Loan Documents, as well as the Collateral Agent and holder of the Deed of Trust and ALR for the benefit of itself and the B Note Holder. (JA 319-320). The B Note Holder is the current holder of the B Loan Documents. (JA 319-320). As Special Servicer for the Note

---

[2]    The "A Note Holder" is U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-GG1, Commercial Mortgage Pass-Through Certificates, Series 2004-GG1. The "B Note Holder") is Bank of America, N.A., successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Mezz Cap Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C1.

Holders, CWCapital Asset Management LLC has full power and authority to service and administer the Loan on behalf of the Note Holders, including, but not limited to, prosecuting actions to enforce and protect the Note Holders' rights and remedies under the Loan Documents and applicable law. (JA 320-21).

*The Foreclosure Proceeding*

The Debtor is in default under the Loan Documents as a result of, among other things, its failure to pay the monthly installment payments for the month of August 2011 and continuing thereafter. (JA 322) (JA 323-325). As a result of the foregoing defaults, the Note Holders commenced a foreclosure action in the General Court of Justice, Superior Court Division for Wake County (the "State Court"), Case No. 12-SP-1267 (the "Foreclosure Action") and obtained an Order from the Clerk of Court finding that the Debtor is in default, the A Note Holder is entitled to foreclose, and authorizing the Trustee to proceed with a foreclosure of the Deed of Trust. (JA 318-322). The foreclosure sale was set for 10:00 a.m. on June 28, 2012, but was stayed by the commencement of the bankruptcy case, approximately 20 minutes before the scheduled foreclosure sale. (JA 140) (JA 326-334).

As of the Petition Date, the balance owed on the A Note totaled at least $14,014,329.16, the balance owed on the B Note totaled at least $1,115,569.43, and the combined balance was at least $15,129,898.59. (JA 1389-1407) (JA 1408-

4

1427).  These amounts have substantially increased due to the passage of time and accrual of expenses.  (JA168-177; 180-89).

*The Claims*

On July 7, 2012, the Debtor filed its Statement of Financial Affairs (as subsequently amended, the "Statement") and Schedules (as subsequently amended, the "Schedules").  (JA 335-372).[3]  According to the Schedules, as of the Petition Date the Debtor had 3 secured creditors (the A Note Holder, the B Note Holder and the Wake County Revenue Department), no creditors holding unsecured priority claims and 35 creditors holding unsecured non-priority claims totaling $51,152.76.  (JA 335-357).  Adjusted to reflect the filed proofs of claim, the Debtor had 35 creditors holding non-priority unsecured claims totaling $45,597.48.  (JA 335-372) (JA 1355-1474).  ***The A Note Holder purchased the claims of 16 general unsecured creditors totaling $31,244.7, or 68% of the unsecured claims.*** (JA 773-775) (JA 890-911).

*The Plan and Disclosure Statement*

On September 26, 2012 the Debtor filed its Plan and Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement").

---

[3]    On September 4, 2012, Schedule F was amended to revise the amount owed to Thomas Linderman Graham dba Grubb & Ellis Thomas Linderman from $10,336.67 to $19,222.63.  (JA 593-605).

(JA 654-666) (JA 667-715).  In relevant part, the Plan provides for the following classification and treatment of unsecured claims:

      a)    Class 5 Allowed General Unsecured Claims.  These claims total approximately $34,000, and the Plan provides that they will be paid in full through quarterly installments of $5,000.00 split pro rata and will accrue interest at the Federal Judgment Rate (as defined in the Disclosure Statement).  (JA 661).

      b)    Class 6: Allowed General Unsecured Claims of less than $1,000.  These claims total approximately $8,000, and the Plan provides that they will be paid in full 120 days after the Effective Date.  (JA 661).

***The Plan indiscriminately grouped together claims held by parties with whom the Debtor was no longer doing business, claims arising from executory contracts which could have been assumed, and government claims together with those held by conventional vendors.*** (JA 654-666) (JA 667-715) (JA 890-911).  In particular, by the time the Debtor filed the Plan, it had already sought approval to replace Thomas Linderman Graham, Inc. as property manager and acknowledged that it was no longer using off-duty police officers for security, yet these claims were given the same treatment as continuing vendors.  (JA 380) (JA 444-453) (JA 654-666) (JA 667-715) (JA 890-911).  The claims held by Techway Systems and Commercial Mechanical Systems, Inc. arose from executory contracts which easily could have been assumed if the Debtor sought preferential treatment for these

creditors.  Further, the Plan grouped 5 claims held by the City of Raleigh and the State of North Carolina together with the general unsecured creditors.  (JA 654-666) (JA 667-715) (JA 890-911).  The Debtor chose to impair all of these claims equally even though it remained profitable throughout the bankruptcy, held $675,000 in cash as of the confirmation hearing and could easily have paid all unsecured creditors immediately in full.  (JA 1615).

On November 29, 2012, the Note Holders filed their Opposition to Confirmation of Chapter 11 Plan (the "Plan Opposition"), asserting that the Plan could not be confirmed because, among other things, (i) the Plan was not fair and equitable as required by Section 1129(b); (ii) the Plan violated Section 1122 because it divides general unsecured claims into multiple classes without a legitimate justification; (iii) there was no accepting impaired class as required by Section 1129(a)(10); and (iv) the Plan was not proposed in good faith.  (JA 778-800).[4]

The Plan confirmation hearing was originally scheduled for December 6, 2012. (JA 870).  Upon completion of the balloting, the Debtor discovered it did not have sufficient votes to confirm the Plan and requested a continuance of the hearing.  (JA 870).  On December 12, 2012, the Debtor filed a First Modification

---

[4]    The Court entered an order conditionally approving the Disclosure Statement on September 27, 2012 and setting a hearing on approval of the Disclosure Statement and confirmation of the Plan for December 6, 2012. (JA 716-717).

to Chapter 11 Plan and Supplement to Disclosure Statement (the "Modification"),

(JA 826-828*), which modified the Plan to create a third class of allowed*

*unsecured claims consisting only of the claims which voted against the Plan*

(Class 4A). (JA 826-828). The Debtor provided no justification for the this class

other than the conclusory statement "[t]he Debtor believes that the actions of the

secured creditor put the secured creditor at odds with the interests of the Debtor

and the Debtor's remaining creditors." (JA 826).

On January 28, 2013 the Note Holders filed an Opposition to First

Modification to Chapter 11 Plan and Supplemental Disclosure Statement (the

"Opposition to Plan Modification"), asserting that (i) the Debtor's creation of the

additional unsecured class was an improper attempt to gerrymander an accepting

impaired class in violation of Bankruptcy Code § 1122 and (ii) the proposed

treatment of Class 4A constituted unfair discrimination against the claimholders.

(JA 869-874).

According to the Report of Ballots Received (the "Ballot Report") filed by

the Debtor on January 30, 2013 only the Debtor's attorneys and its accountants

accepted the Plan. (JA 890-911). The two affirmative votes represented claims

totaling $6,004.23. (JA 890-891). All remaining creditors either rejected the Plan

8

or did not return a ballot.  (JA 890-911).[5]  Because the Ballot Report was filed on the eve of the Confirmation Hearing (as defined below), the Note Holders did not have any opportunity to conduct discovery into whether the attorneys and accountants should be deemed insiders under 11 U.S.C. §101(31).[6]  (JA 1566)

The hearing on the Motion to Dismiss and Plan confirmation was held on January 31, 2013 and February 1, 2013 (the "Confirmation Hearing").  (JA 1475-1650).  On February 15, 2013, the Bankruptcy Court entered the Order Denying Motion to Dismiss and held that the Plan was confirmable with the amended classification scheme.  (JA 944-954).  The Note Holders timely filed the Notice of Appeal of the Order Denying Motion to Dismiss on February 27, 2013.  (JA 971-984).

The Bankruptcy Court entered the Plan Confirmation Order on February 26, 2013.  (JA 955-970).  The Note Holders timely filed the Notice of Appeal of the Plan Confirmation Order on March 8, 2013 and requested a stay pending appeal from the Bankruptcy Court by motion dated March 11, 2013.  (JA 1003-1021).

---

[5]     On January 29, 2013, the Debtor filed a Motion to Designate Ballots Pursuant to 11 U.S.C. § 1126(e) arguing that the Note Holders were attempting to block any chance at the Debtor's reorganization and therefore had purchased the claims in bad faith.  (JA 875-878).  On January 30, 2013, the Note Holders filed a Motion to Strike and Opposition to Motion to Designate Ballots Pursuant to 11 U.S.C. § 1126(e) (the "Opposition to Motion to Designate").  (JA 882-889).

[6]     The District Court deemed these parties insiders.  (JA 2011).  The accountants' claim has been expunged.  (Bankr. Docket No. 337).

9

The Bankruptcy Court denied the request for a stay by Order dated March 21, 2013 and the Note Holders filed a similar request before the United States District Court for the Eastern District of North Carolina (the "District Court") on April 16, 2013. (JA 1965-1968).  By Order dated June 28, 2013 the District Court granted the Note Holders' request for a stay pending appeal (the "Stay Order").  (JA 1981-2000)  In order to avoid any prejudice which might result from the Stay Order, the District Court directed the Debtor to pay the remaining unsecured claims out of the Note Holders' cash collateral.  (JA 1998-99).

The Debtor disregarded District Court's order to pay the remaining claims and instead filed objections to 10 of the 21 remaining claims which had not been purchased by the Note Holders, ***including the claim of its accountants, Walker Rodeniser & Welsh LLP, which had voted in favor of the Plan***.  (JA 890-891) (Bankr. Docket Nos. 297-331).[7]  In each case, these objections were devoid of substance, unopposed, and resulted in the extinguishment of the claim.  (Bankr. Docket Nos. 325-333, 335).  By Order dated June 24, 2014 the District Court overturned the Plan Confirmation Order and remanded the case for further

---

[7]    Although filed after entry of the Plan Confirmation Order, the Court is free to take judicial notice of the objections and resulting orders.  Fed. R. Evid. 201, Advisory Committee Note to Subdivision (f) ("In accord with the usual view, judicial notice may be taken at any state of the proceedings, whether in the trial court or on appeal."); MOORE'S FED. PRAC. 3d, § 310.10[5][b]; *Matter of Am. Biomaterial Corp.*, 954 F.2d 919, 922 (3d Cir. 1992).

10

proceedings before the Bankruptcy Court. (JA 2001-2019). The Debtor appealed to this Court, but has not sought a stay pending appeal.

## SUMMARY OF THE ARGUMENT

The Debtor's brief focuses exclusively on issues of fact and ignores the numerous errors of law in the Bankruptcy Court's decision. In *Travelers Insurance Co. v. Bryson Properties (In re Bryson Props., XVIII)*, 961 F.2d 496 (4th Cir. 1992), this Court held that separate classification of similar claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." Here the Debtor filed a plan, conducted balloting, then amended the plan to create a new class of claims containing only the "no" votes. There could be no more obvious case of gerrymandering solely "to secure the vote of an impaired, assenting class." As a matter of law, the post-balloting segregation of "no" votes in a new class based only the identity of the holder cannot satisfy *Bryson* and constitutes an impermissible avoidance of the procedure and law governing designation of votes under 11 U.S.C. §1126(e) .

Even if the Plan was confirmable in theory, the Debtor has not introduced *any* evidence to substantiate its purported "business justification" for separately classifying the purchased claims. Moreover, its assertion that it needed to pay the claims not held by the Note Holders more quickly in order to maintain business relationships with vendors is irreconcilable with the record before the Court. The

11

Debtor had already acknowledged that it was no longer doing business with several of the creditors and several others are plainly not "vendors" in the conventional sense (e.g. the North Carolina Dept. of Labor). The Debtor filed the Plan with $675,000 in cash on hand and could easily have paid all of the creditors in full if it was legitimately worried about maintaining good will. (JA 1615). However, the full measure of the Debtor's hypocrisy was not revealed until after the District Court stayed the Plan Confirmation Order and directed the Debtor to pay the remaining unsecured creditors in full. Not only did the Debtor refuse to comply with this instruction, it objected to nearly half of the claims which it previously argued had to be paid quickly to maintain business relationships. This duplicitous behavior conclusively demonstrates the Debtor's "business justification" to be pure fiction.

Lastly, even if this Court approves the Debtor's classification scheme, it should remand the case for further proceedings to (i) permit the Note Holders to conduct discovery on the insider status of the creditors voting in favor of the Plan, (ii) revalue the collateral and reevaluate feasibility in light of the passage of time and lack of a stay pending appeal; and (iii) redo the balloting in light of the change in the composition of the creditor body.

12

## STANDARDS OF REVIEW

In bankruptcy matters, the Court of Appeals applies two standards of review on appeal. *See, e.g. Travelers Insurance Co. v. Bryson Properties (In re Bryson Props., XVIII)*, 961 F.2d 496, 499 (4th Cir. 1992). Conclusions of law are reviewed *de novo* and the bankruptcy court's findings of fact are reviewed for clear error. *See Id.*, Fed. R. Bankr. Pro. 8013. A mixed question of law and fact is reviewed under a hybrid standard where the Court reviews the legal conclusion *de novo* and reviews the factual underpinnings supporting the legal conclusion under a clearly erroneous standard. *See, e.g., U.S. Dept. of Health & Human Servs. v. Smitley*, 347 F.3d 109, 116 (4th Cir. 2003). Although appeal to this Court triggers an independent inquiry, the panel is free to grant persuasive weight to an intermediate appellate opinion of the District Court. *In re Foust*, 52 F.3d 766, 768 (8th Cir. 1995); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters., Ltd.),* 994 F.2d 1160, 1163 (5th Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). In addition, it is well-settled that the Court of Appeals "review[s] judgments, not opinions," and is therefore empowered to "affirm the district court on any ground that would support the judgment in favor of the party prevailing below." *Everett v. Pitt Cnty. Bd. of Educ.*, 678 F.3d 281, 291 (4th circuit), quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 643 n. 10 (4th Cir. 2011)) (internal quotation marks omitted).

13

# ARGUMENT

## I.     Applicable Law.

As the Plan proponent, the Debtor has the burden of introducing sufficient evidence to establish, by a preponderance of the evidence, that the Plan satisfies the requirements of Bankruptcy Code § 1129(a) and (b).  *In re Briscoe Enters., Ltd.,* 994 F.2d 1160, 1163 (5th Cir. 1993); *In re RadCo Props., Inc.*, 402 B.R. 666, 671-72 (Bankr. E.D.N.C. 2009) ("The proponent of the reorganization plan bears the burden of proof as to introduction and persuasion that each of [the Section 1129 requirements] has been satisfied.").

## II.     The Debtor's Classification Scheme is Improper.

The Bankruptcy Court erred in approving the Debtor's classification scheme because the Debtor openly and obviously manipulated the Plan to create an impaired consenting class.  All parties agree that the ability to separately classify similar claims is governed by this Court's decision in *Travelers Insurance Co. v. Bryson Properties (In re Bryson Props., XVIII)*, 961 F.2d 496 (4th Cir. 1992). *Bryson* holds that separate classification of similar claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." 961 F.2d at 502 (*quoting In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir. 1992)).  As interpreted by the Bankruptcy Court, this means a debtor must have "a legitimate business

14

justification for separate classification of similar claims and different treatment for the separate classes." (JA 949).

In approving the Debtor's classification scheme, the Bankruptcy Court stated:

> The justification given for classifying the purchased claims separate from the other classes included the debtor's desire to maintain trade and professional relationships with the creditors contained in classes 5 and 6. Paying such creditors quickly fosters relationships for future business. That rationale simply does not apply to the claims which were purchased by CWCapital. The impetus to pay [trade claims] quickly is no longer a driving force once an institutional creditor purchases the claim. Therefore, the desire to pay the unsecured claims not purchased by CWCapital more quickly is a legitimate business purpose.

(JA 950). This holding is premised on incorrect conclusions of law and findings of fact which are irreconcilable with the evidence.

**A.** **_Segregation of "No" Votes After Balloting Is a <u>Per Se</u> Violation of <u>Bryson</u>._**

As a matter of law, amending a plan to segregate dissenting votes is an improper manipulation of voting. This is the very definition of gerrymandering and it is prohibited by _Bryson_, 961 F.2d at 502; _see also In re Greystone III Joint Venture_, 995 F. 2d at 1279 (5th Cir. 1992) ("[there is] one clear rule that emerges from otherwise muddled case law on § 1122 claims classification: thou shalt not

15

classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

In circumventing this seemingly obvious conclusion, the Bankruptcy Court found that the assignment of trade claims to the Note Holders was itself a legitimate business justification for creating a new class. (JA 949-951). As a result, whereas *Bryson* holds that separate classification cannot occur without a legitimate business justification in order to prevent manipulation of voting ("There must be some limit on the debtor's power to classify creditors… The potential for abuse would be significant otherwise…"), ***the Bankruptcy Court effectively overruled Bryson by holding that the need to isolate dissenting claims is itself a legitimate business justification.***

In its Appellant's Brief, the Debtor essentially argues that its subjective belief that trade creditors should be paid more quickly is *per se* sufficient to justify separate classification. Appellant's Brief at pg. 19. ("The question before the court was ***Burcam's*** reason for separate classification. The trade creditors could not have testified to that motivation.") (Emphasis in original). As observed by the District Court in reversing the Bankruptcy Court's error of law on this point:

> If a debtor may simply state on the record that it separately classified trade creditor claims because it "desires" to pay them more quickly than institutional creditors, without any documentary or other evidence the separate classification will actually enhance the chances

16

> for an effective reorganization, the debtor's classification discretion is not meaningfully limited.

(JA 2012) (internal citations omitted). Accordingly, if the Bankruptcy Court's decision is reinstated the classification limits established by *Bryson* will cease to exist.

**B.    *The Status of a Claim Cannot Be Altered By Assignment.***

The Bankruptcy Court's decision depends on the premise that the legal right to payment on a claim can be altered by its post-petition assignment. (JA 949-951). This proposition is incorrect as a matter of law and has recently been rejected in the context of several cases involving claims purchasing. *See KB Toys, Inc.*, 470 B.R. 331 (Bankr. D. Del. 2012); *Enron Corp. v. Springfield Assoc. LLC*, 379 B.R. 425 (S.D.N.Y. 2007); *see also* COLLIER ON BANKR. ¶ 1122.03[3][a] (16th. Ed. 2012) ("[O]nly the nature of the claim or interest is supposed to be relevant to classification, not the identity of the holder of the claim or interest.").

In the *KB Toys* decision, the Delaware bankruptcy court conducted an exhaustive review of the history and policy implications of claims trading and held "[A] claim in the hands of a transferee has the same rights and disabilities as the claim has in the hands of the original claimant." *In re KB Toys, Inc.*, 470 B.R. 331, 335 (Bankr. D. Del. 2012) *citing In re Metion, Inc.*, 301 B.R. 634, 642-3 (Bankr. S.D.N.Y. 2003). Similarly, in *Enron* the District Court for the Southern District of New York held that "[a]n assignee stands in the shoes of the assignor." 379 B.R. at

435 (quoting *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942)); *see also Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) ("Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor."); *Ward v. Sun Valley Foods Co., Inc.*, 212 Fed. Appx. 386, 391 (6th Cir. 2006) (unpublished) ("[I]t is a fundamental rule of the law of contract that the assignee stands in the shoes of the assignor, possessing the same rights and remaining subject to the same defenses as the assignor.").[8]    The *KB Toys* and *Enron* decisions were both rendered in the context of a debtor asserting affirmative defenses which were personal to the original holders of the claims, but the principal is the same: The rights and privileges attendant to a claim remain unchanged regardless of assignment.

Perhaps the most persuasive expression of this concept arises from the simple fact, as noted by the District Court, that ***the Bankruptcy Code requires classification of claims, not creditors***. 11 U.S.C. § 1122.  Further, the Debtor fails to appreciate or address the impossible administrative burden which would result from permitting reclassification of transferred claims. For example, unless a creditor has filed a proof of claim, no notice is required to assign a claim.  Fed. R. Bankr. Pro.  3001(e).  How is a debtor or any other party in in interest expected to

---

[8]    *KB Toys* and *Enron* disagree as to whether a defense personal to the transferor travels with a claim sold to a bona fide purchaser for value, an issue not present in this case.

track the identity of claimholders for classification purposes?  The Debtor argued to the District Court that creditors who sold their claims to the Note Holders have effectively been paid, but what happens if such transfers are recourse?  Under the logic of the Bankruptcy Court decision, a Debtor would not only need to track the identity of transferees, but also the terms of sale.  If a debtor can segregate claims based on the transferees, would objecting creditors then be given the opportunity to discover the current holders of assenting claims?  These problems merely highlight the fact that post-confirmation segregation of "no" votes is a perversion of the Bankruptcy Code that would have far-reaching consequences if permitted to stand.

### C.    *The Debtor's Classification Scheme Is a Disguised Section 1126(e) Objection.*

Section 1126(e) provides a separate mechanism for a Bankruptcy Court to consider the identity and motives of a dissenting creditor which acquires one or more claims.   Under Section 1126(e), a bankruptcy court has discretion to disregard the ballots of any entity whose acceptance or rejection of a plan was not in good faith.  However, the burden of establishing bad faith is on the party seeking to designate the ballots, and the burden is a heavy one.  *See, e.g., In re Adelphia Communications Corp*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006); *In re Lichtin/Wade, LLC*, Case No. 12-00845, 2012 WL 6576416 *3 (Bankr. E.D.N.C. Dec. 12, 2012) *slip op.* ("The party seeking to designate a vote as submitted in bad faith has a heavy burden of proof.").  The Debtor's efforts to segregate "no" votes

based on the fact that they are held by the Note Holders is a *de facto* designation of these votes without meeting the "heavy burden" mandated by the courts under § 1126(e) .

**D.    *Deep River and Grandfather Mountain Do Not Support the Bankruptcy Court's Decision.***

The Bankruptcy Court relied primarily on *In re Deep River Warehouse, Inc.*, Case No. 04-52749, 2005 WL 2319201 (Bankr. M.D.N.C. 2005), and its predecessor, *In re Grandfather Mountain L.P.*, 207 B.R. 475 (Bankr. M.D.N.C. 1996), for the proposition that claims held by a lender may be separately classified. These cases are both factually and legally inapposite.[9]

A critical threshold distinction is that both cases considered separate classification of ***unsecured deficiency claims***, not trade claims assigned to a lender.  In *Deep River* the court held that while "reasons may exist to separately classify ***deficiency and trade creditor claims***, the Debtor in this case failed to provide important indicia that the motive behind separate classification is non-

---

[9]    The Debtor dedicates several pages of its brief to the argument that the purchased claims are no longer "substantially similar" to the other claims and therefore no business justification is required.  Appellant's Brief pgs. 22-25.  To be clear, this would mean that the Debtor is ***prohibited*** from classifying these claims together.  11 U.S.C. 1122(a).  There is, of course, no support in the law for this proposition.

manipulative." 2005 WL 2319201 at *7 (emphasis supplied).[10]  The *Deep River* court based its analysis on *Grandfather Mountain*, which held that separate classification was justified by the significant legal differences between an artificial deficiency claim created by § 1111(b) and general unsecured claims which, in that case, had a right to collect from a solvent general partner.  207 B.R. at 484. Neither case addresses the division of trade claims into separate classes based on post-petition assignments.  In fact, in focusing on the differing legal rights of the claims themselves rather than the identity of the holder, *Grandfather Mountain* argues against such division.[11]

### E.    *Different Treatment Does Not Legitimize Separate Classification.*

The Bankruptcy Court has cited the different treatment given to classes 4A, 5 and 6 in support of confirmation.  Several cases, most prominently *Bryson* and *Deep River*, cite the failure to treat separate classes of unsecured claims differently as indicative of manipulation.  *Bryson*, 961 F.2d at 502 ("Where all unsecured claims receive the same treatment… separate classification on the basis of natural

---

[10]    The language of *Deep River* begs the question of what indicia the Debtor has provided in this cases beyond the unsubstantiated claims of counsel.  The lack of evidence is addressed more fully *infra*.

[11]    The Bankruptcy Court also cited to Collier on Bankruptcy for the proposition that "Claims may also be separately classified when institutional lenders are prepared to accept debt or equity securities in circumstances in which creditors would prefer cash payment of percentage of their claims." ¶ 1122.03[3][a]; (JA 949).  The relevance of this point is unclear, since the Note Holders in this cases are not prepared to accept treatment different from the remaining unsecured creditors.

21

and unnatural recourse claims is, at a minimum, highly suspect."); *Deep River*, 2005 WL 2319201 at *7 ("If the two classes received different treatment under the Plan **for legitimate reasons** the separate classification might be viewed in a different light.") (Emphasis supplied).

The Bankruptcy Court turns these cases on their heads by suggesting that different treatment by itself legitimizes separate classification. This is not a natural reading of *Bryson* and is at odds with the practical reality of plan confirmation. Although not discussed at length, it is clear that the *Bryson* Court's intent was to suggest that truly legitimate reasons for separate classes will generally result in different treatment by necessity. The logic does not work in reverse and *Bryson* cannot be read to suggest that an otherwise arbitrary difference in treatment will legitimize separate classification.

### F. *Merely Continuing To Do Business With Certain Creditors Does Not Justify Separate Classification.*

The Order Denying Motion to Dismiss states: "Separate classification for creditors with whom the debtor continues to do business is a legitimate business purpose." (JA 949). The cases cited in the Order do not support the Court's decision. (JA 948-951). Trade creditors must be **essential** to a debtor's reorganization to warrant separate classification and preferential treatment. *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894 (Bankr. S.D. Ohio 2004) ("The **need** to maintain good will" can support separate classification.); *In re Coram*

22

*Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) ("Separate classification is justified because they are **essential** to a reorganized debtor's ongoing business") (Emphasis supplied).

More extensive treatment of this concept appears in "critical vendor" cases, which universally hold that the burden is on the debtor to prove that a creditor is indispensable before preferential treatment will be allowed.  *See, e.g. In re United Am., Inc.*, 327 B.R 776, 782 (Bankr. E.D. Va. 2005) (holding that a trade creditor must be "necessary" to reorganization, there must be no practical or legal alternative, and the creditor must be otherwise unwilling to continue to provide services), *citing In re Kmart Corp.*, 359 F.3d 866 (7th Cir., 2004); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 18-20 (Bankr. M.D. Fla. 2005) (finding that critical vendors must be "indeed critical and have refused to do business with a debtor absent payment."); *In re CoServ, L.L.C.*, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002) (holding that debtor must show "critical vendor" status by preponderance of evidence).

### G.   The Cases Cited By the Debtor Do Not Support Separate Classification.

The Debtor cites numerous cases as alleged examples of permissible business justifications for separate classification.  Appellant's Brief at pgs. 29-30. These cases are either factually inapposite or simply do not support the Debtor's position.  As a threshold matter, each case involved a reorganization of a going

23

concern rather than single asset real estate and, as such, present far more fertile grounds for establishing legitimate competing interests that impact an actual reorganization. Needless to say, ***none of the cases consider the post-balloting segregation of "no" votes in a new class or the more basic issue of whether the transfer of a claim can itself be a legitimate business justification for separate classification.*** The examples are addressed below in the same order presented by the Debtor:

- *In re Adelphia Communications Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2006). Stating that separate classification must not "offend one's sense of due process and fair play" and permitting separate classification based on the "legal character" of the claims, specifically whether or not the claims had been liquidated to a fixed amount.

- *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004). Refusing to permit separate classification of notes "that arose from services provided to the Debtor." *Id.* at 350. The court further stated "a proper determination of what claims are 'substantially similar' focuses on the legal attributes of the claim, not who holds them" and "classification of claims should not be permitted solely on the basis of how the plan proponent thinks the creditor will vote. That is gerrymandering." *Id.*

- *In re Chateaugay Corp.*, 177 B.R. 176 (S.D.N.Y. 1995). Allowing separate classification based upon the legal subordination of claims held by a surety imposed by 11 U.S.C. 509(c).

- *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894 (Bankr. S.D. Ohio 2004. Permitting separate classification of reclamation creditors "who have a sound legal argument that they are not unsecured creditors at all."

- *In re Bernhard Steiner Pianos U.S.A., Inc.,* 292 B.R. 109 (Bankr. S.D. Tex. 2002). Permitting payment of claims held by consignors of pianos in order to help rebuild the Debtor's consignment business. The court found restoration of the consignment business to be critical to reorganization.

- *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986). Allowing separate classification of a trade unions claims where it held a significant "non-creditor" interest and sought to reject a plan to improve its leverage in future collective bargaining. In the present case, the Note Holders' only interest is as a creditor.

### H.  *The Debtor Has Not Met Its Burden of Proof in Establishing a "Business Justification" for Separate Classification.*

There is virtually no evidence of the Debtor's alleged "business justification" of maintaining relations with trade creditors and overwhelming evidence that the real purpose of the Plan was to manipulate voting. As noted above, ***after balloting on the original Plan, the Debtor created a new class containing only the "no" votes.*** The Modification states this was done because "the actions of the secured creditor put the secured creditor at odds with the interests of the Debtor and the Debtor's remaining creditors." (JA 826). This is tantamount to declaring that the "no" votes are at odds with the "yes" votes and is nothing short of an admission that the Debtor's purpose was to engineer an accepting impaired class.

In upholding this manipulation, the Bankruptcy Court stated: "At the hearing, debtor's counsel stated that the justification for separate classification was, in part, the debtor's desire to first pay the trade creditors with whom it

continued to have business relationships." (JA 947). Counsel's representation is not evidence and not one word of this alleged justification appeared in any document or disclosure prior to the hearing. A debtor must prove specific trade creditors are essential to a reorganization in order to justify separate classification and preferential treatment of their claims. *In re Coram Healthcare Corp*, 315 B.R at 349; *In re Snyders Drug Stores*, 307 B.R. at 894; *see also In re United Am., Inc.*, 327 B.R. 776 (Bankr. E.D. Va. 2005) (critical vendor case). Neal Coker, the only fact witness produced by the Debtor, ***failed to provide any testimony to show that the trade creditors in classes 5 and 6 were essential to reorganization or would refuse to do business with the Debtor without special treatment.*** (JA 1591-1621).[12]

In fact, when cross examined on issues relating to specific vendors, Mr. Coker repeatedly testified that the Property is operated by a third-party manager and that he had no first-hand knowledge of the Debtor's relationship with the vendors or the nature of their claims. For example, Mr. Coker testified:

> Q:    Otis Elevator was listed as a creditor. I take for granted that's the same Otis Elevator we see all over the country and that they were responsible for maintaining the elevators?

---

[12]    It is obvious from the names of the trade creditors alone that many of them cannot be essential or even important to the Debtor's reorganization (*e.g.* Killo Pest Control, Marshall's Locksmith, etc.). (JA 335-72).

A:    I would have to have that same assumption because I have always had third party management that separately bids out maintenance but that would be an assumption I would share.

Q:    The things I am going to ask you about specific vendors, you don't have any personal knowledge of those or are all of those issues ones that would need to be asked of the management company?

A:    I am aware of them, but I didn't negotiate them and some of these vendors I have no direct contact with.

(JA 1619-1620).

It is clear from Mr. Coker's testimony that not only has he failed to provide evidence that any particular trade creditor is essential to the Debtor's reorganization, he is not competent to provide such testimony. The Appellant's Brief casts this issue exclusively in terms of the deference to the Bankruptcy Court's interpretation of the evidence, but it could fairly be said that the Debtor did not provide any evidence at all and the credibility of a witness is irrelevant if he is not competent to testify. Accordingly, the District Court correctly held that the Debtor failed to satisfy its burden of proof regarding separate classification of the remaining trade claims.[13]

---

[13]    There does not appear to be any reason why the Debtor could not have called its management company or one or more individual creditors to testify about any alleged business justification.

### I.    The Pre-Confirmation History of the Case Demonstrates that the Debtor's Business Justification is Fiction.

The nature of the claims, the amount of cash on hand and the course of balloting also belie the Debtor's purported business justification. The prepetition claims totaled $46,000. The Debtor filed its petition with $72,000 cash on hand after payment of a $129,000 insider claim. At the time of confirmation, the Debtor had over $675,000 in available cash. (JA 1615). If the Debtor was truly concerned about its relationship with the trade creditors, it could have paid them in full prior to the Petition Date or could have paid them in full on the effective date. Further, the proof of claim forms filed by Commercial Mechanical and Techway Systems demonstrate that these claims were incurred as part of on-going executory maintenance contracts. If the Debtor was truly concerned about these vendors, it could have assumed the contracts and cured the prepetition arrears. Of course, these things were not done because the Debtor's primary motivation was to manipulate voting, not to protect relationships with trade vendors.

The Debtor's treatment of the claims of its former property manager, Thomas Linderman Graham ("TLG"), and a number of Raleigh police officers provide additional proof that its "business justification" is an argument of convenience fabricated on the eve of confirmation. The Debtor's application to employ TLG expressly stated that it was seeking to employ TLG as its "temporary and transitional Property Manager." (JA 391). The Debtor filed a motion to

28

replace TLG as property manager on August 20, 2012.  (JA 444-453).  From that date forward, it was clear that the Debtor would no longer be doing business with TLG.  The Debtor's lack of interest in preserving any relationship with TLG is further demonstrated by its objection to TLG's fee application.[14]  (JA 866-67) (objecting to dismissal until administrative expense claim is paid).  Nevertheless, the TLG claim was not separately classified from the supposedly critical trade creditors until purchased by the Note Holders.  (JA 661) (JA 890-91) (JA 826-27).

The Debtor also scheduled claims for numerous Raleigh police officers who formerly provided security services at the Property.  On August 1, 2012, the Debtor filed a motion seeking to pay these claims in full in advance of a plan.  (JA 380-390).  After a hearing, the Bankruptcy Court denied payment of these claims finding:

> The police officers are not employed as on-going
> employees.  Rather, the need for their services in the

---

[14]    A copy of the Bankruptcy Court docket was included in the record before the District Court for the Eastern District of North Carolina (the "District Court") as Tab 36 of the "Appellants' Appendix," but was inadvertently excluded from the Joint Appendix before this Court. See U.S. Bank N.A., as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-GG1, by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer v. Burcam Capital II, LLC, 5:13-cv-00278-F, (E.D.N.C.) (Docket No. 19, Appendix Tab 36, page 656 (including Bankruptcy Docket No. 155, which was the Debtor's objection to TLG's professional fees).  Nonetheless, the Court may take judicial notice of the objection.

29

> future is uncertain. Like any other unsecured creditor who was unpaid on the day of filing, payment to these creditors must await confirmation of a plan.

(JA 591-592). The Debtor filed its original Plan less than four weeks later. (JA 654-666). Given the opportunity to separately classify the police officers' claims and either (i) pay them in full because "the continued security of the Glenwood Property is essential to its rehabilitation and necessary to preserve the value of the Debtor's estate" as claimed in its motion, or (ii) treat them less favorably because the officers are no longer employed, the Debtor did neither. (JA 654-666). Instead, the officers' claims remained lumped in with the small Class 6 general unsecured claims until purchased by the Note Holders.[15]  The treatment of these claims further proves that the Debtor's purported "business justification" is fiction.

### J.    The Debtor's Post-Confirmation Claim Objections are Irreconcilable with its Business Justification.

The Debtor has contradicted its alleged "business justification" and called into doubt the good faith basis for numerous statements made to this Court, the District Court and the Bankruptcy Court by objecting to the claims of creditors

---

[15]    The Debtor protests that it tried to pay the officers more quickly, but offers no explanation for why they were not then separately classified. Appellant's Brief at pg. 18.  Further, the Debtor never offers any explanation as to why creditors such as TLG, with whom it was plainly no longer doing business, were not separately classified.  These issues were raised before the District Court and the Debtor's failure to address them is damning.

post-confirmation.[16]  Although filed after entry of the Plan Confirmation Order, the Court is free to take judicial notice of the objections and resulting orders.  Fed. R. Evid. 201, Advisory Committee Note to Subdivision (f) ("In accord with the usual view, judicial notice may be taken at any state of the proceedings, whether in the trial court or on appeal."); MOORE'S FED. PRAC. 3d, § 310.10[5][b]; *Matter of Am. Biomaterial Corp.*, 954 F.2d 919, 922 (3d Cir. 1992).

The Debtor repeatedly represented to the lower court that its business justification for separately classifying trade claims was the need to maintain good will with vendors.  (JA 1603).[17]  This is the exact justification relied on by the Bankruptcy Court in its opinion.  (JA 947) and repeated in the Appellee's Brief ("[T]he trade creditors were parties with whom Burcam intended to continue to do business and with whom Burcam wanted to maintain goodwill").  However, post-confirmation, the Debtor has objected to the claims of many of these creditors.  *See In re Burcam Capital II, LLC*, Case No. 12-04729-8, Docket Nos. 297-321, (Bankr. E.D.N.C. May 21-24, 2013).  In each instance, the objection was entirely without substance, unopposed, and resulted in an order denying or reducing recovery on its claim.  *See In re Burcam Capital II, LLC,* Case No. 12-04729-8,

---

[16]   The Debtor's objections included every claim held by the Note Holders' claims which did not vote, and one claim which voted in favor of the Plan.

[17]   This, of course, begs the question of how objecting to the claims of trade vendors fits into the Debtor's strategy to "keep those guys happy."

Docket Nos. 297-321 and 325-333, and 335, (Bankr. E.D.N.C. May 21-24, June 26-28, 2013).

It is virtually impossible to reconcile these objections with the statements of counsel and testimony of the Debtor. For example, in discussing the Debtor's business justification for paying the Note Holders more slowly, counsel stated:

> They are different from the cops, and frankly the other trade creditors we want to continue using. We have got to keep those guys happy. We don't have to keep – we don't have the same articulable business reason for these guys, to keep [the Note Holders] happy, so we classify it separately.

(JA 1493). The Debtor's representative, Neal Coker, later testified:

> Q: All right. Why do you want to pay the vendors you are still working with on a different time frame?
>
> A: Because, I mean, it was painful enough to have to file bankruptcy and never had to do anything like that before. And so, being able to pay our debts on a timely basis and maintain good relationships is important.

(JA 1603). While the Debtor obviously has the right to object to claims, the timing and manner of these objections is further proof that the classification scheme was designed to manipulate voting and the "business justification" was a convenient story made up for confirmation day.

## III.     The Debtor Failed to Establish the Existence of an Impaired Consenting Class Under Section 1129(a)(10).

Because the Note Holders' claims are impaired, in order for the Plan to be confirmed, at least one class of claims impaired under the Plan has to vote to accept the plan, "*without including any acceptance of the plan by any insider*." Bankruptcy Code § 1129(a)(10) (emphasis added).  The Debtor failed to carry its burden under Section 1129 (a)(10) because it (i) artificially impaired the unsecured claims in Classes 5 and 6 solely to obtain "cramdown" of Plan; and (ii) the Note Holder was prevented from obtaining discovery on the potential insider status of the Debtor's accountants and attorneys, the only votes in favor of the Plan.

### A. *Classes 5 and 6 are Artificially Impaired.*

The Debtor had the ability to pay the unsecured claims in full, on the effective date, but chose not to in order to engineer an impaired class.  Because Classes 5 and 6 were artificially impaired, these classes cannot be considered impaired consenting classes for purposed of confirmation.  *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 132 (8th Cir. 1993); *In re Dunes Hotel Assocs.,* 188 B.R. 174, 185-86 (Bankr. D.S.C. 1995).

33

Under the amended Plan, the Class 5 and 6 unsecured claims **total less than $11,000.**[18]  (JA 672) (JA 826-827) (JA 890).  All of the unsecured claims, including those held by the Note Holders, total approximately $46,000.  (JA 1615).  At the Confirmation Hearing, the Debtor testified that (i) it had approximately $675,000 in its bank accounts which it could use to pay all of its unsecured claims in full on the effective date.  (JA 1615).  The Debtor further testified that it could have paid all of the unsecured claims, in full, before the Petition Date from the $72,000 the Debtor was holding in its checking account.[19]  (JA 1616).

"[F]or the purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion."  *Windsor on the River*, 7 F.3d at 132.  A debtor simply cannot circumvent the requirements of the Bankruptcy Code by artificially impairing claims in order to manufacture a consenting impaired class to cramdown its lender's secured claim.  *See, e.g., Windsor on the River*, 7 F.3d at 130-32 ("Confirmation of a plan where the debtor engineers the impairment of the only approving impaired class so distorts the meaning and purpose of Section

---

[18]    The Debtor argues that the amount of the claims is irrelevant.  Appellant's Brief at pg. 16.  However, as noted by the District Court, a fundamental purpose of the Bankruptcy Code is to protect the creditors holding the largest stake in the proceedings.  *In re Boston Post Road L.P.,* 21 F.3d 477, 482-3 (2d Cir. 1994).

[19]    The Debtor had $72,000 cash in hand after making its $129,000 preferential payment to its co-owner.

34

1129(a)(10) that to permit it would reduce (a)(10) to a nullity.") (internal citation and quotation omitted); *In re Swartville, LLC*, Case No. 11-08676, 2012 WL 3564171 *5-6 (Bankr. E.D.N.C. 2012) *slip op.* (holding that debtor that had the ability to pay class in full on the effective date, but delayed payment, had artificially impaired the class for voting purposes and denying confirmation); *In re Dunes Hotel Assocs.,* 188 B.R. at 185-86 ("[A]n attempt to manipulate the Chapter 11 process by engineering technical and literal compliance with § 1129(a)(10) by artificially impairing a class of claims in the face of overwhelming opposition by truly impaired creditors constitutes a perversion of Chapter 11.")

As the Eighth Circuit recognized in *Windsor on the River*, artificial impairment arises most frequently in circumstances where, as here, the debtor is dealing with an oversecured creditor and, in order to obtain confirmation of its plan, must have an impaired class of creditors. 7 F.3d at 131-32. True impairment in these cases is difficult because typically the excess value in the asset will be sufficient to pay the unsecured claims in full. *Id.* at 132. Such plans should not be confirmed because confirmation "might encourage similarly situated debtors to view the bankruptcy code as an alternative to re-financing." *Id.*

**B.** ***The Note Holders Were Not Permitted to Conduct Discovery on the Potential Insider Status of the Attorneys and Accountants.***

The Report of Ballots Received was filed less than 24 hours before the Confirmation Hearing. (JA 890). At that time, the Note Holders learned that the

only two votes for the Plan consisted of the claims of potential insiders, specifically (1) an unsecured claim of $5,054.23 held by the Debtor's accountant and (2) an unsecured claim of $950.00 held by the Debtor's attorneys. (JA 890-91). The Debtor did not offer any evidence on the nature of its relationship with its pre-petition attorneys and accountants and the Note Holders were denied any opportunity to conduct discovery on the potential insider status of these creditors. (JA 1475-1650).

An "insider" relationship may be found when the relationship between the debtor and creditor is sufficiently close to warrant careful scrutiny "to guard against collusive approval of plans by person whose dealings with the debtor are at less than arm's length." *Three Flint Hill L.P. v. Prudential Life Ins. Co. (In re Three Flint Hill L.P.)*, 213 B.R. 292, 299 (Bankr. D. Md. 1997); *see also In re Dunes Hotel Assocs.*, 188 B.R. 174, 180-81 (Bankr. D.S.C. 1995) (holding that debtor's attorneys were "insiders" and its vote could not be used to confirm the debtor's plan).

In this case, the Plan was confirmed based solely upon the *de minimis* claims of the Debtor's accountant and its attorneys. The Note Holders expressly requested the opportunity to conduct discovery to determine whether these claimholders were insiders. (JA 1566). Counsel stated at the confirmation hearing that the Debtor expected to continue to use both creditors in the future. (JA 1493).

36

Further, the proof of claim filed by attorneys demonstrates that they were representing the Debtor in connection with its defaulted mortgage right up through the Petition Date. (JA 1362-1372). Ballots were due on November 29, 2012, yet the Debtor waited until less than 24 hours prior to the January 31, 2013 confirmation hearing to file its report. (JA 890). This appears to have been calculated to limit inquiry into the results of voting. Under these circumstances, the Bankruptcy Court erred by confirming the Plan without allowing the Note Holders the opportunity to conduct discovery.

## IV. The Debtor Failed to Establish that the Plan was Filed in Good Faith Under Section § 1129(a)(3).

The Plan was not filed in good faith as required by Bankruptcy Code § 1129(a)(3) because this case is essentially a two-party dispute with no legitimate accepting impaired class of creditors. *See Swartville*, 2012 WL 3564171 * 5-6 (finding that bankruptcy case was filed in bad faith where it was essentially a two-party dispute, debtor artificially impaired claims to obtain an accepting impaired class and plan was confirmed based on accepting vote of creditor holding a *de minimis* unsecured claim). For a plan to satisfy the "good faith" requirement there must be a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *Swartville,* 2012 WL 3564171 * 5-6 (citing *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995)).

37

The good faith requirement was not satisfied here.  This Bankruptcy Case is a two-party dispute between the Debtor and the Note Holders.  The Debtor filed its Bankruptcy Case to restructure the Loan.  It has no other legitimate impaired classes of creditors.  In order to achieve confirmation of its cramdown Plan, the Debtor artificially impaired the claims of unsecured creditors and gerrymandered classes of claims to obtain an accepting impaired class.  The Plan was accepted based solely on the *de minimis* claims of two unsecured creditors.  The Debtor transferred funds to its insider within a year of the Petition Date, yet the Disclosure Statement does not mention this transfer and the Plan contains no provision for the recovery and distribution of these funds.  Indeed, setting aside the $675,000 the Debtor had on hand as of confirmation, recovery of the insider transfer alone would have been sufficient to pay all of the Debtor's outstanding trade debt in full. *See In re Fiesta Homes of Georgia, Inc.,* 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (finding that the plan proposed by debtor that did not provide for recovery of avoidable transfers to insiders did not satisfy § 1129(a)(3), denying confirmation of plan, and converting the case to a case under Chapter 7).

## V.    Even if the Court Approves the Debtor's Classification Scheme, Remand is Required for Further Proceedings Before Confirmation is Possible.

The Debtor's failure to obtain a stay pending appeal and the enormous passage of time since the hearing make it is necessary to remand this case for

further proceedings before confirmation is possible. (JA 1475). The Bankruptcy Court issued the Confirmation Order on the premise that the value of the Note Holders collateral was at least $17.3 million, (JA 1389, 1408), and the Note Holders' combined claims were $15,129,898.59. To the extent the value of the collateral has remained greater than the debt, the accrual of interest under 11 U.S.C. 506(b) has substantially enlarged the Note Holders' secured claim.[20] If the value of the collateral has dropped below $15,129,898.59, the Note Holders likely have an unsecured deficiency claim, which may impact balloting. The size of the secured claim will bear directly on feasibility, which should also be reassessed based on updated financial projections, since those included in the Plan are hopelessly out of date.

The Court should require re-balloting since, in addition to the possibility that the Note Holders have an unsecured deficiency claim, the composition of the remaining creditor body has changed significantly. As noted above, the Debtor objected to 10 out of the remaining 21 claims not held by the Note Holders, including one of its two "yes" votes. Each of these objections has been granted. (Bankr. Docket Nos. 325-333, 335). Accordingly, even if its classification scheme is approved, the Debtor will now be seeking confirmation of a Plan that forcibly restructures over $15 million on secured debt ***on the strength on one affirmative***

---

[20]    Note that until July 2014 the Debtor was not making adequate protection payments. (Bankr. Docket No. 611).

***vote cast by the law firm which represented the Debtor in its pre-petition effort to restructure the Loan.*** This fact further highlights the need for discovery to determine if the law firm should be deemed an "insider".

Lastly, events since the Confirmation Hearing bear on the Debtor's good faith in proposing this Plan and call into question numerous statements made to the Bankruptcy Court by Neal Coker. In particular, the Bankruptcy Court should reassess the good faith basis for the Plan in light of the Debtor's objection to numerous claims it previously insisted must be paid to maintain "good business relations" and it failure to pay these claims in full when instructed to do so by the District Court.

## CONCLUSION

WHEREFORE, based upon the foregoing and the entire record before the Court, the Note Holders respectfully request that the Court affirm the District Court decision dated June 24, 2014.

RESPECTFULLY SUBMITTED this 20th day of October, 2014.

> */s/ Brent W. Procida*
> VENABLE LLP
> Gregory A. Cross
> Brent W. Procida
> Catherine M. Guastello
> 750 East Pratt St., Suite 900
> Baltimore, MD 21202
> Telephone: (410) 244-7400
> Facsimile: (410) 244-7742

and

WOMBLE CARLYLE SANDRIDGE
  & RICE LLP
Constance L. Young
301 S. College Street
Charlotte, NC  28202
Telephone: (704) 331-4972
Facsimile: (704) 975-4370

41

## LOCAL RULES OF FOURTH CIRCUIT, RULE 34(a)
## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe that oral argument on the foregoing appeal should be heard because these appeals present novel issues of great importance to bankruptcy courts within the Fourth Circuit. Appellees believe that oral argument and the opportunity to address any questions the Court may have will facilitate the Court's review of these appeals.

## Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,807 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using 14 point font.

*/s/ Brent W. Procida*
VENABLE LLP
Gregory A. Cross
Brent W. Procida
Catherine M. Guastello
750 East Pratt St., Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

and

WOMBLE CARLYLE SANDRIDGE
  & RICE LLP
Constance L. Young
301 S. College Street
Charlotte, NC  28202
Telephone: (704) 331-4972
Facsimile: (704) 975-4370

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit via the CM/ECF on October 20, 2014.

I hereby certify that parties of record to these appeals who are either registered CM/ECF users, or who have registered for electronic notice, or who have consented in writing to electronic notice, will be served via the CM/ECF system.

I hereby certify that the party of record to these appeals have also been served via email:

William P. Janvier
JANVIER LAW FIRM PLLC
1101 Haynes Street, Suite 102
Raleigh, North Carolina 27604
919 582-2323
Fax : 866 809-2379
Email: bill@janvierlaw.com

I hereby certify that I am causing 8 paper copies of the foregoing to be delivered to the post or courier by October 21, 2014 for delivery to the United States Court of Appeals for the Fourth Circuit.

/s/ Brent W. Procida
VENABLE LLP
Gregory A. Cross
Brent W. Procida
Catherine M. Guastello
750 East Pratt St., Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

and

WOMBLE CARLYLE SANDRIDGE
  & RICE LLP
Constance L. Young
301 S. College Street
Charlotte, NC  28202
Telephone: (704) 331-4972
Facsimile: (704) 975-4370